**NOT FOR PUBLICATION**

United States District Court
for the District Of New Jersey

TAMAINE BOYD

               Plaintiff,

   v.

THE HUDSON COUNTY PROSECUTOR'S OFFICE; EDWARD J. DEFAZIO, Individually and in his capacity as Prosecutor for the Hudson County Prosecutor's Office; DETECTIVE JOHN KOLAKOWSKI; DETECTIVE COSMO FASCIANO; DETECTIVE LAMAR NELSON; DETECTIVE KENNETH SNIDER; DETECTIVE LONNIE FRIEDMAN

               Defendants.

Civil No.: 11-6744 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

      Plaintiff Tamaine Boyd filed this lawsuit in 2011, alleging that his civil rights were violated when he was unjustly arrested and indicted in the course of an ongoing criminal investigation. Three defendants—Hudson County Sheriff Frank Schillari, his office, and Hudson County itself—were voluntarily dismissed from this suit pursuant to Fed. R. Civ. P. 41(a)(1) on May 6, 2013. (*See* Notice of Voluntary Dismissal [D.E. 44].) The remaining defendants now move for summary judgment under Fed. R. Civ. P. 56, arguing in part that they are entitled to the protection of qualified immunity. [D.E. 40.] Boyd opposes the motion [D.E. 45] and defendants have filed a reply [D.E. 46]. The Court held oral argument, and for the reasons that follow, concludes that the record compels the entry of summary judgment in favor of the moving defendants.

1

## I. Background

The following factual recitation is based on the stipulated narrative in the Final Pretrial Order [D.E. 39], supplemented by references to the deposition testimony of Detective Kolakowski [D.E. 40-4]; Kolakowski's arrest-warrant affidavit [D.E. 40-6 to 7]; Detective Kenneth Snyder's[1] August 18, 2009 supplemental investigation report, which is signed by non-party Felix Pacheco [D.E. 40-8]; a Hudson County criminal complaint against Boyd [D.E. 40-9]; Hudson County indictment number 0937-05-2010, dated April 27, 2010, and signed by prosecutor DeFazio [D.E. 40-10]; a March 21, 2011 memorandum of dismissal prepared by a non-party assistant prosecutor and signed by DeFazio [D.E. 40-11]; and circa-2009 wiretap applications [D.E. 45-3]. Although Boyd was not deposed, the defendants introduced a DVD video recording of a January 2011 meeting between Boyd and agents at the Hudson County Prosecutor's Office.

The parties do not dispute the facts. Rather, at issue is what inferences can fairly be drawn from them to support Boyd's constitutional claims.

\* \* \*

Beginning in 2007, officials in Hudson County worked in tandem with other law-enforcement agencies on an ongoing investigation of a suspected drug-distribution ring. The lead detective was John Kolakowski of the Hudson County Prosecutor's Office.

One of alleged players in the drug conspiracy was Felix "Urkel" Santiago. Investigators obtained wiretap orders to monitor Santiago's communications (via applications under the New Jersey Wiretapping and Electronic Surveillance Control Act) over a period of time. Through

---

[1] Snyder's name is misspelled in the case caption and appears in several different variants throughout the case filings. The Court will employ the spelling found in his incident report.

these methods, the authorities tracked with whom, and when, Santiago and others were discussing aspects of the suspected drug conspiracy.

During August 2009, investigators listened in on several calls between Santiago—who was using a cell-phone number assigned to a Hoboken resident named "Jordan Mike"—and an unknown person, who was using a cell-phone number assigned to a "Curtis Lane." On August 6, 7, and 8, the unknown person and Santiago engaged in what investigators determined were coded discussions about drugs.

On August 18, investigators intercepted a phone call in which Santiago and the unknown party agreed to meet in person. Detectives Snyder, Nelson, and Fasciano traveled to Hoboken, where they set up surveillance. Detective Fasciano observed a white Ford Expedition double parked on the Northeast corner of Washington and Second. After a quick DMV check, the detectives learned that the car was registered to a "Tamaine Boyd."

Seeking to connect the driver of the Ford to the unknown person on the intercepted calls, the detectives dialed the "Curtis Lane" number from a restricted line. The driver, who was standing on the street corner with Santiago, could be seen to answer his phone, ask who was calling, and hang up. Having concluded his business with Santiago, the driver drove off, followed for a short time by the detectives.

After Snyder returned to the Narcotic Task Force Headquarters, he ran the Ford's information through the DMV system, and located a driver's license photograph of its registrant, Tamaine Boyd. In his subsequent Supplemental Investigation Report, Snyder used the photograph to positively identify Tamaine Boyd as the person who drove the Ford Explorer, met with Santiago, and used the "Curtis Lane" phone number during the meeting.

The investigation continued. Months later, in late November 2009, Kolakowski submitted a lengthy affidavit in support of an arrest-warrant application for Boyd and others. His affidavit reproduced the transcripts of the relevant telephone calls, discussed their coded nature, gave a narrative of the surveillance, and described how the detectives came to believe that the person on the intercepted calls who ultimately met with Santiago was Tamaine Boyd. (Kolakowski Aff. ¶¶ 42–45.) Kolakowski interpreted the conversations as establishing an ongoing drug distribution conspiracy, with Boyd acting as a "middle level drug distributor/supplier of heroin." (Kolakowski Aff. ¶ 42.) Kolakowski indicated that Boyd was not involved in a simultaneous cocaine conspiracy. (*See* Kolakowski Aff. ¶¶ 5H, 52.)

Superior Court Judge Keven Callahan reviewed Kolakowski's affidavit and issued an arrest warrant. Boyd was arrested and made bail. On April 27, 2010, he was indicted, based in part on Kolakowski's testimony before a Hudson County grand jury.[2]

More time went by. Then, on January 14, 2011, about 14 months after he was arrested and nine months after he was indicted, Boyd, accompanied by counsel, met with investigators (primarily Kolakowski). As memorialized on the DVD recording of the meeting, Boyd quickly identified the voice of the person conversing with Santiago on the intercepted phone calls as belonging to Curtis Lane, a close friend of his—and the person to whom the cell-phone number was actually registered. According to Boyd, Lane was driving the Ford Explorer on the day of the surveillance. Boyd told the investigators that the car was registered in his name because Lane was unable to get insurance. The detectives found Boyd to be credible, and the assistant prosecutor assigned to the case filed a memorandum of dismissal. As support for the decision to

---

[2] Santiago and others appear to have been separately indicted and convicted in in the Southern District of New York. *See* S.D.N.Y. Crim. No. 1:09-cr-01016; *see also United States v. Velez*, 461 F. App'x 67 (2d Cir. 2012) (nonprecedential summary order).

drop the charges against Boyd, the memorandum noted that the person on the intercepted phone calls was heard saying that he had "finished probation," which was inconsistent with Boyd's lack of criminal history. (*See* Mem. of Dismissal ¶ 5.) The indictment was dismissed pursuant to a March 21, 2011 memorandum of dismissal.

* * *

Boyd filed this suit in November 2011. The second amended complaint [D.E. 30] named as defendants the detectives who had participated in the investigation, the prosecutor and the sheriff (and their offices), and the County of Hudson itself. Several John and Jane Does were also pleaded.

Characterizing both his arrest and prosecution as a violation of his civil rights, Boyd charged the defendants with wrongly targeting him as part of their larger Santiago investigation. He alleged that at the time of his arrest, detectives and prosecutors claimed to be "in possession of audio and video evidence showing [Boyd's] involvement in a drug transaction"—and that the recordings were "clearly not of [Boyd]." (2d Am. Compl. ¶ 23.) According to the complaint, despite knowing that Boyd was not guilty, defendants decided to prosecute him anyway, ignoring protestations of innocence made both in and outside of court; further, they refused to provide Boyd with exculpatory information that they had in their possession, and Kolakowski gave the grand jury inaccurate information in order to get an indictment. (*See* 2d Am. Compl. ¶¶ 24–29.)

Boyd's claims sounded under the United States Constitution (through 42 U.S.C. § 1983), the New Jersey Constitution (through the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2(c)), and New Jersey common law. The counts, as enumerated, were as follows:

- Count 1: Unconstitutional false arrest and false imprisonment;

- Count 2: Unconstitutional malicious prosecution;

- Count 3: Unconstitutional unlawful seizure/false arrest;

- Count 4: Unconstitutional abuse of process;

- Count 5: Unconstitutional custom, practice, or policy (per the Hudson County Prosecutor's Office and Hudson County Sheriff's Office);

- Count 6: Common-law negligence; and

- Count 7: Common-law intentional infliction of emotional distress

(*See* 2d Am. Compl. ¶¶ 32–68.)

The defendants timely filed answers to the complaint. The County/Sheriff's Office defendants and the prosecutor's office/detective defendants were represented separately, and each set cross claimed against the other for indemnification and contribution. [D.E. 31, 33.] However, Boyd later voluntarily dismissed the County/Sheriff's Office defendants, and neither they nor their cross claims remain part of this suit. [D.E. 44.]

Following discovery, the remaining defendants moved for summary judgment [D.E. 40.], alleging generally that Boyd's claims failed as a matter of law, while also invoking absolute and qualified immunity to suit. They also argued that several of Boyd's state-law claims were barred by operation of the New Jersey Tort Claims Act and by his failure to file a timely Tort Claims notice.

Boyd agreed to dismiss count three, the abuse-of-process claim (*see* Pl.'s Resp. Br. 17 [D.E. 45]); count six, the common-law negligence claim (*see* Pl.'s Resp. Br. 20); and count seven, the common-law intentional infliction of emotional distress claim (*see* Pl.'s Resp. Br. 20). While not specifically pleaded, the Final Pretrial Order indicates that Boyd is raising a common-law malicious prosecution claim. (*See* FPTO 8 [D.E. 39].)

## II. Jurisdiction and Standards

This Court has federal-question jurisdiction under 28 U.S.C. § 1331 to review Boyd's constitutional claims. *See, e.g.*, *McKee v. Hart*, 436 F.3d 165, 168 (3d Cir. 2006).

Summary judgment is appropriately granted when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Both the facts of the case and the inferences flowing reasonably from those facts must be drawn in favor of the non-moving party. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). The non-movant must present "more than a mere scintilla" of evidence, such that a jury could reasonably find in his favor. *Id.* (citations omitted).

The defendants have invoked the doctrine of qualified immunity. Qualified immunity is more than a defense to liability, serving instead to confer immunity from a suit itself. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted). Immunity protects government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The burden of establishing qualified immunity ultimately rests on the official claiming it as a defense. *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

In resolving a qualified immunity claim, a court must decide 1) whether the facts alleged or shown make out a violation of a constitutional right, and 2) whether the constitutional right at issue was "clearly established" at the time of the violation. *Pearson*, 555 U.S. at 232. These steps may be considered in the order that best suits the facts of the particular case. *See id.* at 236.

As the Supreme Court has recently reemphasized, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," protecting "all but the

7

plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks & citations omitted). And although an on-point case is not a prerequisite for a legal question to be "clearly established," existing precedent must "have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks & citations omitted).

In order to make out a claim under 42 U.S.C. § 1983, a plaintiff must show that "a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." *Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013) (en banc).

### III. Discussion

**A) <u>Constitutional Liability and Personal Involvement of Certain Defendants</u>**

In the fifth count of Boyd's complaint, he alleged that the Hudson County Prosecutor's Office and the Hudson County Sheriff's Office were "vested by state law with the authority to make policy on the use of force, effectuating arrests and police-citizen encounters." (2d Am. Compl. ¶ 56.) By failing to "adequately screen, train, instruct, supervise, control, and/or discipline" the individual defendants, Boyd contended, the Offices of the Prosecutor and the Sheriff were both liable for any constitutional injuries he sustained. Both the defendants and Boyd clearly view count five as sounding under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), which extends § 1983 liability to municipalities. *See, e.g.*, *Keenan v. City of Phila.*, 983 F.2d 459, 468 (3d Cir. 1992) (citing *Monell*, 436 U.S. at 695). And at oral argument, counsel for Boyd argued in support of a *Monell* claim against prosecutor DeFazio.

8

However, *Monell* only applies to suits against a municipality. DeFazio could arguably be a proxy for the municipality, but Hudson County (along with the Sheriff's Office) has already been dismissed. Thus, the only way DeFazio can remain is if he is an individual who is separately cognizable under 42 U.S.C. § 1983, which requires Boyd to proceed under a theory of supervisory liability. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated on other grounds as stated in Kasper v. Cnty. of Bucks*, 514 F. App'x 210, 216 n.5 (3d Cir. 2013). Boyd also sued the Hudson County Prosecutor's Office itself. To the extent that the office, which is not a separate entity that can be sued, is a proxy for the County, the County has already been dismissed; to the extent that the office is a proxy for the State, the State is immune in federal court under the Eleventh Amendment. *See Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) (per curiam); *Wright v. State*, 169 N.J. 422, 452–53 (2001).

As to Boyd's claims against detectives Nelson, Fasciano, and Friedman, liability cannot attach under § 1983 unless a defendant was personally involved in the civil-rights violation—*respondeat superior* is not enough. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *accord Bizzell v. Tennis*, 449 F. App'x 112, 115 (3d Cir. 2011) (nonprecedential per curiam). Nelson and Fasciano participated in the initial surveillance and in the investigation, but Boyd has nowhere alleged that they were involved in his misidentification or his subsequent arrest and prosecution. Friedman is entirely absent from the narrative; in fact, his role is so unclear that his inadvertent omission from defendants' moving papers (*see* Oct. 11, 2013 Letter [D.E. 48]) went initially unnoticed. Although in a dismissal posture it might reasonably be inferred that the named detectives continued to participate after Boyd was arrested, counsel for the defendants correctly pointed out during oral argument that there is no evidence in the record

9

that they did anything but conduct surveillance. Without some evidence, claims against these defendants cannot survive summary judgment.

### B) False Arrest, Malicious Prosecution, and Unlawful Seizure

#### 1) *Facts and Arguments*

Boyd's first three claims of false arrest/false imprisonment, malicious prosecution, and unlawful seizure are cognizable under 42 U.S.C. § 1983 because they are, in effect, allegations that the detectives and other state officials violated his Fourth Amendment rights by arresting, seizing, restraining, and prosecuting him without probable cause. *See Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268–69 (3d Cir. 2000) ("Although not all actions by police officers are governed by the Fourth Amendment . . . the constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis."). The Third Circuit has explicitly held that the existence of probable cause is an element of each of the above causes of action, as they all relate to unlawful detention or restraint. *See, e.g.*, *James v. City of Wilkes-Barre*, 700 F.3d 675, 683 (3d Cir. 2012) ("A false imprisonment claim under § 1983 which is based on an arrest made without probable cause . . . is grounded in the Fourth Amendment's guarantee against unreasonable seizures."); *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998) (malicious prosecution); *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988) (false arrest).

At oral argument, counsel for Boyd maintained that the undisputed facts of the case lead to but one conclusion: the detectives did not have probable cause to arrest Boyd based on the circumstances of the investigation. He repeatedly emphasized that all parties involved "knew" that the phone number was registered to Lane, and not Boyd. The only fact pointing to Boyd was the car registration, which (counsel argued) might have supported a day-of-observation detention based on reasonable suspicion, but not a months-later arrest based on probable cause.

Counsel emphasized that the detectives were reckless by not pursuing the obvious: that Lane, not Boyd, was the culprit. This recklessness was compounded, according to the argument, by the defendants' failure to drop the charges despite "knowing" that they had the wrong man, which was demonstrated by, among other things, Kolakowski's decision to present "false" information to the grand jury.[3]

Boyd's papers assert that the sum of the evidence was simply that "a car registered to him was briefly spotted at a location where two individuals who previously had a conversation regarding heroin arranged to meet." (Pl.'s Response Br. 13.) This does not amount to probable cause, because the officers could not establish any agreement between Boyd and Santiago to distribute heroin. (Pl.'s Resp. Br. 13–14.) Citing *Malley v. Briggs*, 475 U.S. 335 (1986), Boyd argues that a reasonable officer could not have viewed this evidence as establishing probable cause to arrest. (Pl.'s Resp. Br. 16–17 (citing *Briggs*, 475 U.S. at 337, 341, 345).)

    2) *Legal Standard*

In *Briggs*, the Supreme Court held that "the same standard of objective reasonableness . . . applied in the context of a suppression hearing in [*United States v. Leon*, 468 U.S. 897 (1984)] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." *Id.* at 344. Under the *Briggs/Leon* test, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost." *Id.* at 344–45.

Boyd also relies on the analysis in *Dowling v. City of Philadelphia*, which looks to whether an arrest occurred and, if it did, whether the arrest was made without probable cause. *Dowling*, 855 F.2d at 141. But as defendants point out, *Dowling* involved an arrest made without

---

[3] However, "a grand jury witness has absolute immunity from any §1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012).

a warrant.  *See id.*  The more-appropriate baseline test is found in *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000), in which the Third Circuit developed the Supreme Court's *Briggs* jurisprudence. *See id.* at 789–90.

In *Wilson*, the Third Circuit examined a civil-rights claim "that the arresting officer . . . both lied and omitted material facts during his application for Wilson's arrest warrant." *Id.* at 783.  Although the district judge had dismissed on the basis of qualified immunity, the Third Circuit emphasized that "an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest. "  An officer could still be held liable if he "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and  (2) . . . such statements or omissions are material, or necessary, to the finding of probable cause."  *Wilson*, 212 F.3d at 786–87 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)) (internal quotation marks omitted).  The court held that recklessness was the minimal mental state required because "negligence by public officials is not actionable as a due process deprivation of a civil right."  *Id.* at 789 n.5 (citation omitted).

The Circuit went on to discuss how "reckless disregard" can differ in cases involving omissions versus assertions.  When an officer *omits* evidence from a document like a warrant application, the omission is made with reckless disregard if "an officer withholds a fact in his ken that any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Id.* at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). However, "a police officer cannot be expected to present a judge with complete background," so slight variations in a photo array would not be problematic under the test.  *Id.*

With regard to assertions, reckless disregard occurs when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)) (internal quotation marks omitted). Even minor details can evince recklessness where they show the willingness of the affiant to distort the truth. *Id.*

After a court evaluates the omissions and assertions, it must still determine whether they were material to the probable cause finding. *Id.* at 789. In *Wilson*, despite the existence of problematic assertions and omissions, the Third Circuit held that "the District Court correctly found that no reasonable jury could find facts that would lead to the conclusion that Wilson's 'corrected' warrant lacked probable cause." *Id.* at 791–92. The Circuit thus agreed that there was no violation of the underlying right to remain free of unlawful arrest. *Id.* at 792.

3) *Discussion*

Mindful of the Court's obligation to construe the record and draw reasonable inferences in favor of Boyd, the Court nevertheless concludes that he has failed to adduce sufficient record evidence that would allow a jury to reasonably find in his favor on these claims.

Both in his papers and at oral argument, Boyd's contention has been "there was only one piece of evidence suggesting I was involved: the car registration."[4] This is simply not the case. Detective Snyder positively identified the person he witnessed in Hoboken as Boyd, and by extension the detectives believed that the person on the tapes was Boyd, too. As it transpired, Detective Snyder was wrong—all parties agree on this point. Boyd has presented no evidence

---

[4] As the Court pointed out during argument, Boyd has minimized the fact that if he had not participated in the plan to register the Ford in his name instead of his uninsurable friend Lane, he would not have surfaced as a suspect.

13

that would suggest that Snyder's blunder was anything other than a mistake, or that any other person affirmatively realized the extent of the mistake earlier than 2011.[5] And a mistake does not render Snyder or the other detectives "plainly incompetent" and thus undeserving of immunity. *See Messerschmidt*, 132 S. Ct. at 1249.

Cases involving similar fact patterns stand for the proposition that negligence is not actionable and that a warrant affidavit need not contain the "omitted material," such as investigatory techniques that were not utilized, that Boyd suggests should have been included. In one case from the Fourth Circuit, the court distinguished "mix-ups" in arrest warrants from intentional falsehood or reckless exclusion/inclusion, noting that "an officer is not required to exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." *Miller v. Prince George's Cnty.*, 475 F.3d 621, 630 (4th Cir. 2007) (internal quotation marks & citation omitted). In *Beard v. City of Northglenn*, 24 F.3d 110, 114 (10th Cir. 1994) (White, J., (Ret.)), the Tenth Circuit emphasized that impeaching "an otherwise valid warrant on the ground that it was issued on specified information that was false and critical to the finding of probable cause requires proof that the affiant seeking the warrant knew that the challenged information was false or that he had a reckless disregard for its truthfulness." *Id.* at 114. The court dismissed the idea that error in hindsight was relevant, because "[u]nder the Fourth Amendment our inquiry is focused neither on the existence nor the consequence of [the] error but on the intention behind it." *Id.* at 116. And the Third Circuit, in a nonprecedential opinion in a dismissal posture, addressed head-on a mistaken-identity fact pattern, emphasizing that a supporting affidavit need not include "examples of possible

---

[5] Nor does Boyd explain how after-discovered awareness of his possible innocence, even coupled with a delayed disposition, would be relevant to the *original determination of probable cause*, and reliance thereupon.

14

investigatory tactics that were either unsuccessful or not used." *Badillo v. Stopko*, 519 F. App'x 100, 106 (3d Cir. 2013).

Here, Boyd has not adduced any evidence of deliberate falsehood or recklessness, and his characterization of information not included in the warrant-application affidavit as "omissions" is unpersuasive. Kolakowski's affidavit accurately tracks the facts presently stipulated to. Neither he nor Snyder hid the fact that the phone number was registered to Curtis Lane—a fact the detectives might reasonably find less significant because Santiago's phone was registered under another name. The information allegedly "omitted" is not made up of facts known and suppressed, but rather is a collection of things that the detectives did not do (or have to do), such as obtain additional "voice identification" to further confirm Boyd's identity. (*See* Pl.'s Resp. Br. 16.)

Nor, for that matter, did the affidavit contain affirmative statements that were objectively untrue. Boyd attacks Kolakowski's affidavit for describing him as a "middle level drug distributor" because "[w]hile it may be inferred that the unknown individual and Mr. Santiago are talking about heroin and the quality of heroin that may have been in their possession, there was nothing in the conversation to establish what the unknown individual's role was in the hierarchy of a drug distribution ring." (Pl.'s Resp. Br. 14–15.) This ignores the context of Kolakowski's statements, which was the ongoing investigation into a multi-party drug distribution ring. Placed in that context, Kolakowski's description of the person he believed to be Boyd was reasonable.

For the foregoing reasons, the Court finds that the warrant affidavit did not contain assertions or omissions that were false under the standard in *Wilson*. Accordingly, the defendants did not violate Boyd's constitutional rights under the first prong of *Wilson*.

Because the arrest was reasonable under *Wilson*, and because the record demonstrates that Boyd did not choose to bring critical information about Lane until January 2011 (contrary to the allegations in the complaint), the Court holds that the defendants did not violate Boyd's constitutional rights. Boyd's arrest was in accordance with constitutional principles, and Boyd has adduced no evidence to show any reason why his continued prosecution would have become untenable prior to January 2011. Thus, the defendants are entitled to summary judgment on the merits, and the Court need not reach the second prong (the "well established right" inquiry) of the qualified-immunity standard.

### C) Supervisory Liability and State Claims

In light of the above holding, Boyd cannot separately maintain a supervisory liability claim against DeFazio. If the defendants reasonably believed that probable cause existed, then Boyd has not demonstrated a failure on DeFazio's part (assuming without deciding that DeFazio is actually vulnerable to suit in this supervisory role).

Finally, because judgment will be entered for the defendants on all of Boyd's federal claims, under 28 U.S.C. § 1367(c)(3) the Court declines as a matter of discretion to exercise jurisdiction over the supplemental state-law claims. *See Bright v. Westmoreland Cnty.*, 443 F.3d 276, 286 (3d Cir. 2006); *Bryant v. Adventist Health System/W.*, 289 F.3d 1162, 1169 (9th Cir. 2002). Those claims will be dismissed.

### IV. Conclusion

The Court grants defendants' motion for summary judgment on Boyd's federal claims. An appropriate order will be entered.

January 6, 2014 /s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.